J-A22004-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: RELINQUISHMENT OF: D.L.W., JR., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.M.-W., NATURAL MOTHER | : : : : : : : | No. 596 MDA 2020 |

Appeal from the Decree Entered March 13, 2020
In the Court of Common Pleas of Lackawanna County
Orphans' Court at No(s):  A-5-2020

BEFORE:  SHOGAN, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:              **FILED SEPTEMBER 18, 2020**

B.M.-W. (Mother) appeals from the order involuntarily terminating her parental rights to her son, D.L.W., Jr. (Child), born in December of 2015.[1]  We affirm.

In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court set forth the factual and procedural history of this case, which the certified record supports.  **See** Orphans' Court Opinion, 5/11/20, at 1-10.  Pertinent to our review, Child suffers from Eosinophilic Esophagitis (EOE), which involves inflammation of the esophagus "due to an excess number of allergy cells."  Orphans' Court Opinion, 5/11/20, at 2, n. 1 (citation to record omitted).  In addition, Child has gastroesophageal reflux disease.  N.T., 2/10/20, at 73.  On

---

[1] In the same order, the orphans' court involuntarily terminated the parental rights of Child's father, D.S., Sr. (Father), who did not appeal.

multiple occasions, Child was diagnosed with failure to thrive as a result of insufficient weight gain as well as weight loss. *Id.*; N.T., 2/20/20, at 54-55. In May of 2017, when he was approximately 17 months old, Child had surgery for placement of a gastrostomy tube (G-tube), which his pediatric gastroenterologist described as a small tube placed into the stomach "so that we can provide nutrition. . . ." *Id.* at 55. Child's medical treatment includes "dietary elimination" of foods removed from his diet and then reintroduced to determine the allergens causing his EOE. N.T., 2/20/20, at 56-57. Child also receives steroids and other medications for reflux symptoms. *Id.*

In May of 2017, the Lackawanna County Office of Youth and Family Services (CYF) began providing services to the family as a result of reported lapses in Child's care, substance abuse by Mother and Father, and domestic violence. Orphans' Court Opinion, 5/11/20, at 1 (citation to record omitted).

In June of 2017, Child was enrolled in Trinity Child Care Center (Trinity), a daycare center for medically fragile children. N.T., 2/21/20, at 63, 65. Trinity provided Child with daily transportation to its facility and established a plan of care that included following Child's dietary restrictions, administering Child's medications, and regularly weighing Child. *Id.* at 66.

In August of 2017, the court adjudicated Child dependent after Mother, Father, and Child became homeless. N.T., 2/10/20, at 13, 58. The court did not remove Child from Mother and Father's custody.

In February of 2018, Child was hospitalized for malnourishment, and the court removed Child from Mother's custody.[2]  N.T., 2/10/20, at 14-15.  By October of 2018, Mother had secured housing and was employed.  Also, Mother was in treatment for substance abuse, which included a Suboxone program.  Finally, Mother was maintaining regular visits with Child at the CYF office.  *Id.* at 23.

On October 29, 2018, Mother and Child commenced a two-week inpatient feeding program at Good Shepherd Rehabilitation Network (Good Shepherd) for the purpose of helping Child eat and drink through his mouth so that the G-tube would no longer be necessary.  N.T., 3/4/20, at 9.  The program educated Mother about Child's dietary restrictions, calculating and measuring Child's caloric intake, and maintaining food logs.  *Id.* at 10-11; N.T., 2/10/20, at 23.  When Child and Mother were discharged from the program on November 19, 2018, Child was placed with Mother on a trial basis. N.T., 3/4/20, at 20; N.T., 2/10/20, at 25.

In January of 2019, the court returned custody of Child to Mother.[3]  N.T., 2/10/20, at 27.  On June 24, 2019, the court removed Child from Mother's

---

[2] When Child was placed in February of 2018, Father was not residing with Child and Mother.  N.T., 2/10/20, at 59.

[3] As best we can discern, Child's dependency was not terminated.

custody due to Child's weight loss,[4] Mother's failure to keep appropriate food logs, and Mother sending Child only sporadically to Trinity. *Id.*; N.T., 2/21/20, at 68, 78-79; Orphans' Court Opinion, 5/11/20, at 8 (citation to record omitted).

The court then placed Child with Father on a trial basis. Orphans' Court Opinion, 5/11/20, at 8 (citation to record omitted). On October 3, 2019, Child was removed from Father's custody and placed with the foster family who had cared for him in 2018. *Id.* At 10 (citation to record omitted).

On January 14, 2020, CYF filed a petition for involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Multiple hearings were held on February 10, 20, and 21 of 2020, and

---

[4] Child's nutritionist, Samantha Hollock, testified that on May 2, 2019, Child was mildly malnourished. On June 27, 2019, Child's weight measurements signified that he was moderately malnourished. N.T., 2/21/20, at 151.

March 4, 5, and 9 of 2020.[5, 6] The evidence revealed that at the time of the

proceedings, Child continued to have a G-tube. N.T., 2/20/20, at 77.

_____

[5] CYF presented the following witnesses: Amy Helcoski, CYF caseworker from May of 2017 until July of 2019; Leslie Nelson, Aveanna Healthcare nurse manager; Dean R. Focht, III, M.D., by telephone, Child's pediatric gastroenterologist; Laurie Campfield, M.D., by telephone, Child's pediatrician since September of 2017, through the time of the subject proceedings; Michelle Johnston, a registered nurse and Director of Trinity; Samantha Hollock, by telephone, Child's nutritionist; Rebecca Miller, inpatient care manager for the pediatric unit at Good Shepherd; Abigail Sanders, CYF caseworker from July of 2019 until October of 2019; Carissa Dube, CYF caseworker from October 2019 through the time of the subject proceedings; and Sadie O'Day, CYF supervisor. Mother testified on her own behalf.

[6] During the hearing, an attorney-guardian *ad litem* (GAL) represented the legal and best interests of Child, then four years old. The GAL stated on the record in open court that he does not have a conflict of interest in representing Child's legal and best interests. *See* N.T., 2/10/20, at 50. At the conclusion of the testimonial evidence, the GAL advocated for termination of Mother's parental rights. *See* N.T., 3/9/20, at 100.

We conclude that the orphans' court complied with *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017), which held that pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, which the Court defined as a child's preferred outcome. *L.B.M.*, 161 A.3d at 180. In addition, the orphans' court complied with *In re T.S.*, 192 A.3d 1080 (Pa. 2018), which held that in cases where there is no conflict between a child's legal and best interests, a GAL "representing the child's best interests can also represent the child's legal interests. . . ." *T.S.*, 192 A.3d at 1092; *see also In re Adoption of K.M.G.*, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*) (emphasis in original) (citation omitted) (*limited appeal granted*, December 9, 2019) (holding that this Court "does **not** have the authority [to] review *sua sponte* whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding. Rather, . . . this Court's authority is limited to raising *sua sponte* the issue of whether the orphans' court violated Section 2313(a) by failing to appoint **any** counsel for the [c]hild in a termination hearing.").

However, Child was eating well, receiving proper nutrition, and his dietary restriction was fish and seafood. *Id.* at 77, 90-91; N.T., 2/21/20, at 163. Child was no longer in a "catch up" situation with his weight. N.T., 2/21/20, at 189.

By order dated and entered on March 13, 2020, the orphans' court involuntarily terminated Mother's parental rights. On April 9, 2019, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On May 11, 2020, the court filed its opinion pursuant to Rule 1925(a).

Mother presents the following issues for our review, which we re-order for ease of disposition:

A. Whether the [orphans'] court erred as a matter of law and/or manifestly abused his discretion in determining [that CYF] presented sufficient evidence to satisfy the grounds for termination of Mother's parental rights under Sections 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

B. Whether the [orphans'] court erred as a matter of law and/or manifestly abused his discretion in denying Mother's demurrer at the close of [CYF]'s case in chief concerning [CYF]'s failure to demonstrate Child had been removed from the parents for the statutory periods of six (6) months and/or twelve (12) months respectively prior to the filing of the termination of parental rights petition as required under Sections 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

C. Even if this Court determines [that CYF] presented sufficient evidence to satisfy the grounds for termination of Mother's parental rights under Sections 2511(a)(2), 2511(a)(5), and/or 2511(a)(8) of the Adoption Act, whether the [orphans'] court nevertheless erred as a matter of law and/or manifestly abused

its discretion in determining [that] termination of Mother's parental rights is in the best interests of Child?

Mother's Brief at 5.

We review Mother's issues for an abuse of discretion. Our Supreme Court has explained:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 7 -

Instantly, we conclude that the certified record supports the decision of the orphans' court to involuntarily terminate Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provides:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that we need only agree with the trial

court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[7]

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following three elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding services, may properly be rejected as untimely or disingenuous. *Id.* Further, grounds for termination under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the

---

[7] Based on this disposition, we need not consider Mother's arguments relating to Section 2511(a)(5) and (8). We specifically do not consider Mother's second issue on appeal.

contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

In her first issue, Mother argues with respect to Section 2511(a)(2) that CYF failed to prove by clear and convincing evidence that she "is incapable of meeting the present dietary and nutritional needs of Child. . . ." Mother's Brief at 8. Mother asserts that the record does not demonstrate that Child's failure to gain weight was caused by any act or omission on her part. Specifically, she contends that relying on changes in Child's weight and corresponding Body Mass Index (BMI) does not provide clear and convincing evidence of her incapacity to provide for Child's special needs.

Mother relies on the testimony of Samantha Hollock, Child's nutritionist, that a normal weight gain for someone Child's age is four to ten grams per day. N.T., 2/21/20, at 158. She testified that Child, who was malnourished, needed to gain seven or more grams per day "for catch-up growth until the malnutrition is resolved." *Id.*

It is undisputed that on February 20, 2020, while the termination hearings were proceeding, Child weighed 13.49 kilograms. *Id.* at 83. Prior to that, on January 28, 2020, Child weighed 13.8 kilograms. *Id.* at 171. Mother notes that during the 23-three day period, Child's weight decreased by 0.31 kilograms. Mother's Brief at 22. Nevertheless, Ms. Hollock was satisfied that Child's nutritional needs were being met by his foster parents. Mother correctly asserts that Ms. Hollock identified factors, other than malnutrition, which likely accounted for Child's weight loss. *Id.* at 23. Ms. Hollock testified that Child had four teeth pulled during that time and two separate "events where he has gone under anesthesia," which likely affected Child's eating habits. N.T., 2/21/20, at 177-179. As such, Mother argues that CYF cannot "rely upon any bright line weight comparison test as clear and convincing evidence of any incapacity on Mother's part concerning her ability to meet Child's dietary needs." Mother's Brief at 23. Mother asserts, "This is especially apparent given Child had far greater dietary restrictions while in Mother's custody." *Id.* at 23-24.

Upon review, we disagree insofar as there is no record evidence that Child's failure to gain the appropriate weight while in Mother's custody was caused by similar circumstances affecting his eating habits. Contrary to Mother's assertions, the orphans' court set forth in its Rule 1925(a) opinion evidence presented by all of the CYF witnesses in support of its conclusion that Mother's repeated and continued incapacity caused Child to be without essential parental care, control, or subsistence necessary for his physical well-being, and Mother's incapacities cannot or will not be remedied. *See* Orphans' Court Opinion, 5/11/20, at 1-10, 12-15. The court summarized:

> This is no more clearly demonstrated than by her providing unpermitted food to [C]hild in November of 2019. (N.T. March 4, 2020, pp. 129-130). By November of 2019, Mother had received extensive education on feeding [C]hild, spoken with all of his doctors, witnessed [C]hild drop to a dangerously low weight not once, but twice, and still she failed to implement the skills she claims to have developed over the course of this dependency -- skills that she adamantly believes that she can call on to care for [C]hild. (N.T. March 4, 2020, pp. 9-11; 21-22); (N.T. February 20, 2020, pp. 7; 64-65, 69); (N.T. February 21, 2020, pp. 24, 138-139, 146).

*Id.* at 15.

CYF caseworker Carissa Dube testified that Mother fed Child McDonald's pancakes during an unsupervised visit in November of 2019, and the pancakes contained eggs, which Child was not permitted to eat at the time. N.T., 3/4/20, at 128-130. As a result, CYF changed Mother's visits to line-of-sight. *Id.* at 128-129. This incident occurred approximately one year after Child's

- 12 -

inpatient stay at Good Shepherd, when Mother was taught how to provide for

Child's dietary needs.

Rebecca Miller, the inpatient care manager at Good Shepherd, testified

on direct examination:

Q. [I]n your review of the records, how did [M]other do, in terms of receiving and implementing this education?

A. From what I can gather from the records, she, I think, diligently tried to learn, but she struggled throughout the inpatient stay to carry over the education that was being provided to her.

N.T., 3/4/20, at 11. Ms. Miller explained:

On a note that I wrote on November 12th, "Several therapists and I had a conversation with Tara Lopatosfsky," who was the patient court-appointed special advocate. And I had, also, then e-mailed the same information to [CYF] caseworker, Amy Helcoski, that the treatment team does have significant concerns with [M]other's involvement and carry over of education provided. "Treatment team is still concerned. They would like to consider discharging the patient by the end of the week if he's going to be going home with foster parents." They noted. . ., "On weekends, when the patient is here with mom, she has not been able to follow the strategies provided to her successfully -- to successfully see patient for the weekend, therefore, on Monday mornings, patient is off schedule and returns to prior behaviors, such as behavioral . . . and temper tantrums." . . . "Additionally, [M]other is dependent on . . . numbers to measure . . . quantified food intake, as well as, to order appropriate and safe foods for [Child's] very specific diet. Mother's problem-solving is, also, concerning. For instance, on that morning, on this morning, she reported to our therapist that she had not given patient a drink since yesterday evening because his sippy cup was broken. She did not seek a new cup . . . nor ask another staff member to assist with finding a cup[.] [I]nstead, she informed our therapist that foster mom would bring a cup in at some point today, with no plan to give him a drink in the meantime."

Also, my note states: "She also struggles to understand basic measurements of food consumption, i.e., teaspoon versus

tablespoon, despite extensive education . . . provided to her. Because of her difficulty understanding simple measurements, the treatment team has not been able to focus her education on caloric value of food."

*Id.* at 12-14.

Ms. Miller testified that at the time of Child's discharge on November 19, 2018, Mother "still required consistent guidance daily, or with each meal from a staff member, to measure the amounts of food, to calculate the calories, and to make sure she was . . . ordering foods that were safe for him to eat that he would actually enjoy eating." N.T., 3/4/20, at 21. However, "From a medical perspective, [Child] was ready for discharge. He hadn't needed any [G-]tube feeds from the time he was admitted through the time of discharge."

*Id.*

With respect to the G-tube, Dr. Focht, Child's pediatric gastroenterologist, testified that three weeks after discharge from Good Shepherd, Child was eating everything by mouth, and using the G-tube only for medication. N.T., 2/20/20, at 64-65. Dr. Focht testified on direct examination:

Q. And is that consistent with what your recommendations would be at that time?

A. That would be, yes. . . . [W]e don't want the patients to have to rely on a G[-]tube[.] [W]e want them to be able to eat by mouth. . . .

That was tremendous progress.

*Id.* at 65. However, Mother testified that she wanted Child to use the G-tube overnight after his discharge from Good Shepherd to increase his weight while in her custody. N.T., 3/5/20, at 89-90.

As stated above, at the time of the hearings, the G-tube remained in Child. N.T., 2/20/20, at 77. Nonetheless, Mother asserts in her first issue, "Child is presently enjoying the least restrictive dietary restrictions of his young life, [so] there are no longer any barriers to achieve reunification." Mother's Brief at 25. Mother claims she would "have no problem providing Child with a sufficient amount of food while adhering to the remaining seafood/shellfish dietary restriction." *Id.* Dr. Focht's testimony contradicts this assertion.

Dr. Focht opined that Child is at risk if returned to Mother's care. He testified at length as follows:

> Q. [T]hroughout your time working with [C]hild, do you have an opinion as to whether or not [Child] is at risk if he's in the care of [M]other and [F]ather?
>
> A. I feel that [Child] is at risk of losing weight and exacerbations of his [EOE].
>
> Q. And would that put [Child] at risk of bodily injury?
>
> A. It would put [Child] at risk of developing strictures in his esophagus that could require dilations in the future if his [EOE] doesn't remain under control[.] [I]t would put him at risk for developmental concerns because he really needs . . . good nutrition now, . . . as all of the nutrition that young[] kids [need] while their brains are fully developing at this time[.] [I]t's so important.
>
> Q. So, this could actually affect the rest of his life?

- 15 -

A. Absolutely.

N.T., 2/20/20, at 79-80.

Dr. Focht also testified as to when the G-tube could be removed:

Q. And what is your recommendation regarding the removal of the G[-t]ube?

A. I would love to get the G[-t]ube out as soon as you can possibly get a G[-t]ube out. In general, we keep a G[-t]ube in place for a minimum of six months of not using it for anything so that we can see that a child is gaining weight appropriately and is not going to need it so we don't have to put it back in at a later time.

If he stays with the foster dad, I think that the G[-t]ube potentially, [Child] continues to do as well as he has been doing whenever he's in the foster care, then I would anticipate that the come out potentially as early as this coming summer.

Q. And now, why is it specific that he stayed with the foster dad for the G[-t]ube to come out, do you have concern regarding [M]other and [F]ather?

A. If he was with mom and dad, my concerns are that in the past he has had issues with weight loss, and there has been times when mom [has] asked us to allow her to use the G[-t]ube, and so I would be more hesitant to pull it out until we see that he is doing well without needing to use it for a longer period of time[.] I would be concerned that there would be a higher likelihood that he would end up having to put it in if feeding issues were to persist or return.

Q. So, say, hypothetically if [Child] were to be returned to either the care of his mother or father today, what's the earliest you would recommend removal of the G[-t]ube?

A. I don't have a specific date in mind, but it would be longer than six months. I would probably want to see it for a minimum of maybe 12 months to see how he's doing, make sure that he continues to do very well.

N.T., 2/20/20, at 78-79.

- 16 -

In addition, the testimony of Sadie O'Day, the CYF supervisor from the outset of this case, contradicts Mother's assertion that she would "have no problem providing Child with a sufficient amount of food while adhering to the remaining seafood/shellfish dietary restriction." Mother's Brief at 25. Ms. O'Day testified on direct examination:

Q. Has [M]other or [F]ather ever displayed an appreciation for the dangerous situation that [Child] found himself in in terms of his malnutrition?

A. No.

Q. Why do you say that?

A. Because any time that I've spoken with either parent, and I've spoken with both of them countless times, the [in]ability to understand not only [CYF]'s concerns but the medical professionals' concern and understand the severity of what continued regression would cause for the child.

There was oftentimes excuses or blaming or reasons given for why it wasn't happening. And I have said to both of them that if there's something that you need help with, if there's something that you don't understand, if there's something that [CYF] could do to help you be able to meet the needs of the child, we will do whatever we can to make that possible.

And the education was required, going out daily.

We tried to [go out daily] when the child first went home. There was a lot of involvement with the daycare and the . . . foster parent at that time. So, I mean, anything that we could have helped with or any way that the parents indicated to us that we were able to assist them in being able to rectify these concerns, but it was just repeatedly either excuses or blaming or some other reason and not saying, okay, well, maybe I need help with this or maybe I don't understand this or maybe it would be helpful if I could learn how to do certain things.

Those were never the conversations. If they are were never constructive conversations, it was always something that ended up with hostility and not about what could we do to move forward and help this child grow to be healthy. It was about whose fault it was and . . . [CYF] not doing what they need to do or whatever the reason was.

But at the end of the day, all that [CYF] wanted was to be able to hear the parents say: okay, well maybe I don't understand this and that, could you help me with this, and we would help them with whatever we could. But we can't help rectify the situation that nobody is taking accountability for or nobody is explaining what they don't understand.

N.T., 3/5/20, at 21-23.

The evidence overwhelmingly demonstrates that Mother's repeated and continued incapacity to meet Child's medical needs has caused him to be without essential parental care, control, or subsistence necessary for his physical well-being. Since 2017, CYF and medical personnel have provided Mother with instruction, training, and significant support in caring for Child's medical needs. Nevertheless, when custody was returned to Mother in January of 2019, Child became malnourished. As such, the evidence demonstrates that Mother's incapacity cannot or will not be remedied. We discern no abuse of discretion by the court with respect to Section 2511(a)(2).

With respect to Section 2511(b), Mother asserts that there is an indisputable bond between her and Child. Therefore, Mother argues that the court abused its discretion in terminating her parental rights. We disagree.

We emphasize:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is

- 18 -

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Further, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Supreme Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The Court observed: "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Mother correctly asserts that Child is bonded to her. However, the CYF caseworkers agree that Child is also bonded with his foster parents. N.T., 3/4/20, at 133-134; N.T., 3/5/20, at 8. Moreover, the caseworkers agree that it is in Child's best interests for Mother's parental rights to be terminated. Ms. O'Day, the CYF supervisor, testified on direct examination:

Q. The severing of which bond would put [C]hild in the best place to have that consistent environment that you spoke of?

A. Severing the bond with the parents would be in the best interest of [C]hild as opposed to the foster parents because it is required for us to take into consideration not just the bond but also his physical well-being, his emotional well-being.

And in regards to the chart that talks about the BMI and the weights,[8] one of the most significant things about the BMI is the malnourishment that the nutritionist spoke about too and Dr. Focht.

So with the BMI going so low, one of the biggest concerns of [CYF] was that [C]hild is not receiving the proper nourishment.

_____

8 On direct examination, Child's current CYF caseworker, Carissa Dube, addressed CYF Exhibit C, which she described as "a chart that demonstrates overall BMI[,] pounds[,] and age . . . of [C]hild. It marks . . . October of 2017[,] and goes all the way to February of 2020." N.T., 3/4/20, at 137. She testified:

Q. So, Carissa, in your reading of Exhibit C, what does it tell you?

A. Just based upon [C]hild's BMI, [C]hild, when he is in foster care, he is thriving.

Q. And how about when he's in the care of his natural parents?

A. When he's in the care of his biological parents, his BMI drops significantly.

*Id.* at 140.

And that crucial growth in his life, in regard to brain development, he needs the proper nourishment in order to be able to have the proper brain development. . . .

. . . The BMI clearly drops down drastically in the times when [C]hild is not in the care of the foster parents. . . .

N.T., 3/5/20, at 19-20.

Based on our review, we discern no abuse of discretion by the orphans' court in concluding that termination of Mother's parental rights serves Child's physical needs and welfare pursuant to Section 2511(b).

For the above reasons, we affirm the order terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/18/2020